**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| **PAMELA MOORE,**<br>8304 Stonybridge Circle,<br>Highlands Ranch, CO 80126<br><br>and<br><br>**DENNIS DESALVO,**<br>31 Island View Terrace**,**<br>Oceanview, NJ 08230,<br><br>Individually and on Behalf of All Others<br>Similarly Situated,<br><br>        **Plaintiffs,**<br><br>          v.<br><br>**MARRIOTT INTERNATIONAL, INC**. (a<br>Montgomery County, Maryland Resident)<br>10400 Fernwood Road,<br>Bethesda, MD 20817-1102<br><br>and<br><br>**STARWOOD HOTELS** AND **RESORTS<br>WORLDWIDE, LLC** (a Montgomery County,<br>Maryland Resident)<br>10400 Fernwood Road,<br>Bethesda, MD 20817-1102<br><br>        **Defendants.** | CASE NO._____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Pamela Moore and Dennis Desalvo ("Plaintiffs") on behalf of themselves and all others similarly situated, allege the following against Defendants Marriott International, Inc. ("Marriott") and Starwood Hotels and Resorts Worldwide, LLC ("Starwood") (collectively "Defendants"), based on personal knowledge as to Plaintiffs and Plaintiffs' own acts and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiffs' undersigned counsel:

## SUMMARY OF THE CASE

1.      Plaintiffs bring this class action against Defendants for their failure to secure and safeguard **hundreds of millions** of customers' protected personal information, including their names, addresses, birthdates, passport numbers, email addresses, phone numbers, and encrypted payment card numbers along with expiration dates ("PII") despite the unauthorized access of such information since 2014.

2.      Marriott is an American multinational, diversified hospitality company that manages and franchises a broad portfolio of hotels and related lodging facilities, with more than 6,700 properties in over 130 countries and territories globally, accommodating over 1.2 million rooms.

3.      Marriott acquired Starwood, including the Starwood guest reservation system database (the "Starwood Database"), for $13 billion in 2016, creating the largest hotel chain in the world and adding Starwood properties to its collection, including W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts, Element Hotels, Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, Four Points by Sheraton and Design Hotels, and even Starwood-branded timeshare properties.

1

4.      On September 8, 2018, Marriot received an alert from an internal security tool of an attempt to access its Starwood Database.   Upon investigation, Marriott confirmed that unauthorized access to the Starwood Database had been occurring since 2014 and that an unauthorized party had copied and encrypted guest information (the "Starwood Data Breach"). While Marriott's investigation into the Data Breach uncovered that hackers had had access to the Starwood Database since 2014, the breach had inexplicably gone undetected during Marriott's acquisition of Starwood in 2016.

5.      On November 19, 2018, Marriot determined that the compromised information from the Starwood Database included the PII of more than ***500 million guests*** who had made a reservation at a Starwood property at least once since 2014.   Specifically, Marriott provided that for about 327 million guests, that compromised information included some combination of their name, mailing address, phone number, email address, passport number, Starwood Preferred Guest account information, date of birth, gender, arrival, and departure information, reservation date, and communication preferences.   For an undisclosed number of guests, the compromised information also included their payment encrypted payment card number along with the expiration date.

6.      Not until ***83 days after*** it purportedly first became aware of the Starwood Data Breach did Marriott publicly disclose on November 30, 2018 – for the first time – that the personal details, including PII, of up to 500 million guests going as far back as 2014 had been compromised.   Despite its public statement on the matter, Marriott has yet to notify individual customers regarding any compromise of their personal information, including PII.

7.      Furthermore, Plaintiffs are informed and believe that the Starwood Database remains vulnerable to hackers as of the date of this filing, and that Defendants have yet to take

the proper steps to secure the Starwood Database and protect their customers' PII even though more than ***3 months have passed*** since they became aware of the Starwood Data Breach.[1]

## JURISDICTION AND VENUE

8.      This court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 proposed class members, and Defendants are citizens of this state and at least one proposed class member is a citizen of a foreign state.   In addition, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper under 28 U.S.C. § 1391(c) because Defendants are corporations that do business in and are subject to personal jurisdiction in this District.   Venue is also proper because substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District, including the decisions made by Defendants' governance and management personnel that led to the misrepresentations and invasions of privacy.

## PARTIES

### A.      Plaintiffs

10.      Plaintiff Pamela Moore is, and at all relevant times was, a citizen of the State of Colorado.   Plaintiff Moore is a Starwood Preferred Guest whose credit card is linked to her Starwood Preferred Guest account.   Plaintiff Moore has stayed at Starwood properties throughout the relevant class period, including Four Points by Sheraton and Design Hotels. In

---

[1] *Complaint* at 2-3 and 15-18, *Hiteshew v. Marriott International, Inc.*, (D. MD. 2018), (Case No. 8:18-cv-03755-PWG) (Dkt. No. 1).

connection with each stay, Plaintiff Moore provided Marriot with other forms of Personal Information.   Plaintiff Moore believed that Marriot took all reasonable, necessary, legally required, and industry standard security measures to protect her PII, and that her PII would remain private. Defendants' represented that they would "send[] emails" to "affected guests."[2] Plaintiff Moore received an email from Defendants on December 3, 2018, informing her of the Starwood Data Breach, and thereby representing that she was an "affected guest."  As a result of Marriott's failure to protect her Personal Information, Plaintiff Moore suffered injuries and damages, including, but not limited to, loss in value of her PII, an increased risk of identity theft, and loss of time and money spent to protect herself from the foreseeable risk of fraud and identify theft.

11.     Plaintiff Dennis Desalvo is, and at all relevant times was, a citizen of the State of New Jersey.  Plaintiff Desalvo is a Starwood Preferred Guest whose credit card is linked to his Starwood Preferred Guest account.    Plaintiff Desalvo has stayed at Starwood properties throughout the relevant class period, including Four Points by Sheraton and Design Hotels.  In connection with each stay, Plaintiff Desalvo provided Marriot with other forms of Personal Information. Plaintiff Desalvo believed that Marriot took all reasonable, necessary, legally required, and industry standard security measures to protect his PII, and that his PII would remain private.  Defendants' represented that they would "send[] emails" to "affected guests."[3] Plaintiff Desalvo received an email from Defendants on December 8, 2018, informing him of the Starwood Data Breach, and thereby representing that he was an "affected guest."  As a result of Marriott's failure to protect his Personal Information, Plaintiff Desalvo suffered injuries and

---

[2] Marriott, *Marriott Announces Starwood Guest Reservation Database Security Incident* (November 30, 2018), *available at* http://news.marriott.com/2018/11/marriott-announces-starwood-guest-reservation-database-security-incident/ (last visited December 10, 2018).
[3] *Id.*

damages, including, but not limited to, loss in value of his PII, an increased risk of identity theft, and loss of time and money spent to protect himself from the foreseeable risk of fraud and identify theft.

### B.      Defendants

12.      Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817.  Marriott conducts business throughout this District, the State of Maryland, and the United States

13.      Defendant Starwood Hotels & Resorts Worldwide, LLC ("Starwood") is an indirect, wholly-owned subsidiary of Marriott. On September 23, 2016, Marriott completed the acquisition of Starwood, formerly known as Starwood Hotels & Resorts Worldwide, Inc. Starwood conducts business throughout this District, the State of Maryland, and the United States.

## FACTUAL BACKGROUND

### A.      Marriott's Strategic Acquisition of Starwood in 2016

14.      Marriott is the largest hotel chain in the world.[4]  Currently, Marriot has more than 6,700 properties in over 130 countries and territories globally, accommodating over 1.2 million rooms.[5]  Marriot reported revenues of more than $22 billion in fiscal year 2017 alone.[6]

15.      In September 2016, Marriott acquired Starwood for $13.6 billion.[7]  The Starwood properties included W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts,

---

[4] Forbes, *You Can Now Check In With A Facial Scan At Marriott In China* (July 24, 2018), *available at* https://www.forbes.com/sites/jennawang/2018/07/24/you-can-now-check-in-with-a-facial-scan-at-marriott/#1745e28c3f7a (last visited December 10, 2018).
[5] Marriott, *Marriott International Brand Fact Sheets*, *available at* http://news.marriott.com/p/marriott-international-brand-fact-sheets-2/ (last visited December 10, 2018).
[6] Marriott, *About Marriott International – Find Your World*, *available at* https://www.marriott.com/marriott/aboutmarriott.mi (last visited December 10, 2018).

Element Hotels, Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, and Four Points by Sheraton and Design Hotels.[8]

16.     According to Marriott CEO Arne Sorenson, Starwood's guest loyalty program — Starwood Preferred Guest — was a "central, strategic rationale for the transaction," as the program's members are deeply loyal to Starwood, generally have higher incomes, and tend to spend many nights on the road.[9]

## B.     The Discovery of, and Severity of, the Starwood Data Breach

17.     On September 8, 2018, Marriot received an alert from an internal security tool of an attempt to access its Starwood Database.[10]  Upon investigation, Marriott discovered that there had been unauthorized access to the Starwood Database since 2014 and that an unauthorized party had copied and encrypted guest information.[11]

18.     On November 19, 2018, Marriot determined that the compromised information from the Starwood Database included the PII of more than 500 million guests who made a reservation at a Starwood property at least once since 2014.[12]

19.     Specifically, for ***327 million people***, the compromised information included some combination of their name, mailing address, phone number, email address, passport number,

[7] Bloomberg, *Marriott Hit by Starwood Hack That Ranks Among Biggest Ever* (November 30, 2018), *available at https://www.bloomberg.com/news/articles/2018-11-30/marriott-found-unauthorized-starwood-database-access-since-2014-jp3xbq64* (last visited December 10, 2018).
[8] Marriott, Marriott International to Acquire Starwood Hotels & Resorts Worldwide, Creating the World's Largest Hotel Company (November 16, 2015), available at http://news.marriott.com/2015/11/marriott-international-to-acquire-starwood-hotels-resorts-worldwide-creating-the-worlds-largest-hotel-company/ (last visited December 10, 2018).
[9] CNBC, *Marriott buys Starwood, becoming world's largest hotel chain* (September 23, 2016), available at https://www.cnbc.com/2016/09/23/marriott-buys-starwood-becoming-worlds-largest-hotel-chain.html (last visited December 10, 2018).
[10] Marriott, *Marriott Announces Starwood Guest Reservation Database Security Incident* (November 30, 2018), *available at* http://news.marriott.com/2018/11/marriott-announces-starwood-guest-reservation-database-security-incident/ (last visited December 10, 2018).
[11] *Id.*
[12] *Id.*

Starwood Preferred Guest account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences.[13]

20.     For an undisclosed number of these individuals, payment card numbers and payment card expiration dates were exposed. Even though the payment card numbers were encrypted using Advanced Encryption Standard encryption (AES-128), Marriott provided that it is possible that the malicious actors were able to obtain the two components needed for full decryption of credit card information.[14]

21.     Marriott failed to publicly disclose that the personal details, including PII, of up to 500 million guests going as far back as 2014 had been compromised until November 30, 2018 – *83 days* after it first became aware of the Starwood Data Breach.[15]

## C.     Defendants Knew or Should Have Known, of the Vulnerabilities of Its Starwood Database

22.     On November 16, 2015, Marriott first announced its intent to acquire Starwood, including the Starwood Database which housed the personal information of Starwood Preferred Guests.[16]

23.     Just *days* after Marriott's announcement, Starwood's Database was publicly falling prey to credit card breaches.[17]   Malware aimed at stealing credit and debit card information was found on payment systems at 54 Starwood hotels in North America, according

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] Marriott, *Marriott International to Acquire Starwood Hotels & Resorts Worldwide, Creating the World's Largest Hotel Company* (November 16, 2015), *available at* http://news.marriott.com/2015/11/marriott-international-to-acquire-starwood-hotels-resorts-worldwide-creating-the-worlds-largest-hotel-company/ (last visited December 10, 2018).

[17] Starwood Hotels and Resorts, *Letter From Our President* (November 20, 2015), *available at* http://www.starwoodhotels.com/html/HTML_Blocks/Corporate/Confidential/Letter.htm?EM=VTY_CORP_PAYMENTCARDSECURITYNOTICE (visited December 14, 2015, using Wayback Machine).

to a letter from Starwood's president Sergio Rivera that was posted online on November 20, 2015.[18] The letter provided, in relevant parts:

> We recently became aware of a malware intrusion that affected some point of sale systems at a limited number of Starwood hotels in North America. Promptly after discovering the issue, we engaged third-party forensic experts to conduct an extensive investigation. We have been working closely with law enforcement authorities and coordinating our efforts with the payment card organizations to determine the facts. We want to assure you that protecting the security of our customers' personal information is a top priority for Starwood.
>
> Based on the investigation, ***we discovered that the point of sale systems at certain Starwood hotels were infected with malware, enabling unauthorized parties to access payment card data of some of our customers***. . . .

24.     On January 22, 2016, a second letter from Rivera was posted on Starwood's website, providing additional details regarding the credit card breach.[19]

25.     Eight months later, Marriott completed its acquisition of Starwood on September 23, 2016.[20]

26.     After the acquisition, Marriott CEO Arne Sorenson specifically addressed the technology integration issues that Marriot faced in linking all the hotels together, stating, in relevant part:

> I think we're off to a good start on the integration [with Starwood], but I think we are by no means declaring victory today. We have a got a lot of work ahead of us. . . . That work includes tackling, perhaps, ***the biggest risk or threat to the success of Marriott's integration of Starwood: figuring out the technology platforms that would link all of its more than 6,100 hotels worldwide, which Marriott hopes to complete by the end of 2018. . . . I think if we identify one [risk] it's***

---

[18] *Id.*; *see also* Starwood Hotels and Resorts, *List of Locations Affected by Payment Card Security Issue* (January 22, 2016), *available at* https://www.starwoodhotels.com/Media/PDF/Corporate/Hotel_List.pdf (last visited December 10, 2018).

[19] Starwood Hotels and Resorts, *Letter From Our President* – Updated (January 22, 2016), *available at* http://www.starwoodhotels.com/html/HTML_Blocks/Corporate/Confidential/Letter.htm?EM=VTY_CORP_PAYM ENTCARDSECURITYNOTICE (last visited December 10, 2018).

[20] Marriott, *Marriott International Completes Acquisition of Starwood Hotels & Resorts Worldwide, Creating World's Largest and Best Hotel Company While Providing Unparalleled Guest Experience* (September 23, 2016), *available at* http://news.marriott.com/2016/09/marriotts-acquisition-of-starwood-complete/ (last visited December 10, 2018).

> ***going to be around technology*** . . . . It takes longer and it costs more than any of
> us would like. . . . We have to make sure we are moving as quickly as we possibly
> can. These technology platforms will really allow us to drive the revenue lift we
> believe is available by having one reservation platform and one loyalty program
> and of course, secondarily, also allows us to deliver these technology platforms at
> lower costs for our owners, because we'll be supporting one and not two.[21]

27.     Additionally, at the time of Marriott's acquisition, hackers were on a "hotel
spree," breaking into systems at Hilton Worldwide, Trump Hotel Collection, and Mandarin
Oriental.[22]

28.     As previously discussed herein, even though Marriott's investigation into the
Starwood Data Breach discovered that hackers had had access to the Starwood Database since
2014, the breach had inexplicably gone undetected during Marriott's acquisition of Starwood in
2016.

29.     Between the long-existing vulnerability in Starwood's Database, the widely
publicized hotel data breaches during Marriot's acquisition of Starwood, and Sorenson's detailed
statements regarding the "threat" of "figuring out" Starwood's Database after the acquisition,
Defendants either were directly aware that the Starwood Database did not have adequate
protection for customer PII and/or were reckless in their inability to detect and remedy the then
already existing vulnerabilities in or around the time of the Starwood acquisition.

30.     Security specialists have taken note of Defendants' improper conduct, with
Andrei Barysevich, a researcher with the security company Recorded Future Inc., stating, in
response to the Starwood Data Breach, "[w]ith all the resources [Marriott and Starwood] have,

---

[21] Skift, *Marriott CEO: Technology Is the Biggest Risk in the Starwood Merger* (May 9, 2017) *available at*
https://skift.com/2017/05/09/marriott-ceo-technology-is-the-biggest-risk-in-the-starwood-merger/ (last visited
December 10, 2018).
[22] The Wall Street Journal, *Marriott's Starwood Missed Chance to Detect Huge Data Breach Years Earlier,
Cybersecurity Specialists Say* (December 2, 2018), *available at* https://www.wsj.com/articles/marriotts-starwood-
missed-chance-to-detect-huge-data-breach-years-earlier-1543788659 (last visited December 10, 2018).

*they should have been able to isolate hackers back in 2015*."[23]   Likewise, Franklin Jones, the chief marketing officer of Cequence Security, stated that "the likelihood is yes, it could have (been detected sooner). There are many different security vendors out there specifically for this reason, to detect traffic that looks suspicious. ... I would agree that this should have been detected long before it did, or at least been reported."[24]

### D.    Defendants Know How Increasingly Valuable PII Has Become

31.    Defendants are, and at all relevant times have been, well aware of the costs and risks associated with payment card fraud and identity theft, as well as the duty they had taken on to protect that PII after it was in their possession. Notably, Marriott has specifically acknowledged in its regulatory filings:

> Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. The integrity and protection of that customer, employee, and company data is critical to our business. . . .
>
> ***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information***. . . .[25]

32.    The PII compromised in the Starwood Data Breach is highly valuable because identity thieves can use the names, email addresses, recovery email accounts, telephone numbers, dates of birth, passwords, security question answers, and other valuable PII to gain access to a variety of existing accounts and websites.  A 2013 Norton report – based on one of the largest

---

[23] *Id* (emphasis added).

[24] USA Today, Marriott data breach: Class-action suit filed; experts ask why it wasn't caught earlier (December 3, 2018), available at https://www.usatoday.com/story/travel/news/2018/12/03/marriott-data-breach-lawsuit-filed-2015-breach-prompts-questions/2190708002/ (last visited December 10, 2018).

[25] Marriott Form 10-Q for the quarter ended June 30, 2016, *available at* https://marriott.gcs-web.com/static-files/8025bdaa-8311-42d7-ba69-09f8cb658528 (last visited December 10, 2018) (emphasis added).

consumer cybercrime studies ever conducted – estimated that at that time, the global price tag of cybercrime was around $113 billion with the average cost per victim being $298 dollars.[26]

33.     Identity thieves can also use the PII compromised in the Starwood Data Breach to harm Plaintiffs and the other Class members through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining identification cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits.  A Presidential Report on identity theft from 2008 explained that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts, and open new ones, and dispute charges with individual creditors.[27]

34.     The problems associated with identity theft are exacerbated by the fact that many identity thieves will wait years before attempting to use the PII they have obtained.  Indeed, in order to protect themselves, Class members will need to remain vigilant against unauthorized data use for years and decades to come.[28]  As Franklyn Jones, the chief marketing officer of

---

[26] Norton by Symantec, *2013 Norton Report*, *available at*
https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf (last visited December 10, 2018).
[27] The Federal Trade Commission, *The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan*, (April 2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last visited December 10, 2018).
[28] *See* Experian, *What is the Dark Web?* (April 8, 2018), *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited December 10, 2018) ("Savvy cyber-thieves also may wait some time before using the data they buy, because immediately following a breach, many people are more guarded and on the lookout for red flags on accounts, bills and their credit report.")

Cequence Security, stated in response to the Marriot breach, "[t]he unfortunate thing is the impact is just getting started, [w]hat typically happens from these breaches is that the data finds its way out to the dark web, and bad people find those stolen credentials and try them on other websites to see if they can get them into other accounts."[29]

35.     As discussed herein, once stolen, PII can be used in a number of different ways. One of the most common ways is that it is offered for sale on the dark web, a heavily encrypted part of the internet that makes it difficult for authorities to detect the location or owner(s) of a website.  Due to its hidden nature and the use of special applications to maintain anonymity, the dark web is a haven for all kinds of illicit activity, including the trafficking of stolen personal information captured through means such as data breaches or hacks.[30]  One 2018 study found that an individual's online identity is worth approximately $1,170 on the dark web.[31]

36.     Once an individual's PII is bought, it may be used to gain access to different areas of that victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from not only the victim's accounts, but from those belonging to the victim's family, friends, and colleagues as well.

## CLASS ALLEGATIONS

37.     Pursuant to Federal Rules of Civil Procedure ("Rules" or "Rule") 23(b)(2), (b)(3), and (c)(4), Plaintiffs, individually and on behalf of all others similarly situated, bring this lawsuit on behalf of themselves and as a class action on behalf of the following Class and Sub-Classes:

---

[29] USA Today, Marriott data breach: Class-action suit filed; experts ask why it wasn't caught earlier (December 3, 2018), available at https://www.usatoday.com/story/travel/news/2018/12/03/marriott-data-breach-lawsuit-filed-2015-breach-prompts-questions/2190708002/ (last visited December 10, 2018).

[30] Experian, *What is the Dark Web?* (April 8, 2018), *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited December 10, 2018).

[31] TOP10VPN, Dark Web Market Price Index (US Edition) (February 27, 2018), *available at* https://www.top10vpn.com/privacy-central/privacy/dark-web-market-price-index-feb-2018-us/ (last visited December 10, 2018).

**Nationwide Class**: All natural persons in the United States who provided PII to Defendants and whose PII was compromised or accessed as a result of the data breach first disclosed by Marriott on November 30, 2018.

**Colorado Sub-Class**: All natural persons residing in Colorado who provided PII to Defendants and whose PII was compromised or accessed as a result of the data breach first disclosed by Marriott on November 30, 2018.

**New Jersey Sub-Class**: All natural persons residing in New Jersey who provided PII to Defendants and whose PII was compromised or accessed as a result of the data breach first disclosed by Marriott on November 30, 2018.

38.     Excluded from the Class and Sub-Classes are Defendants and any entities in which Defendants or their subsidiaries or affiliates have a controlling interest, as well as Defendants' officers, agents, and employees.  Also excluded from the Class and Sub-Classes are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family.  Plaintiffs reserve the right to amend the definitions of the Class and/or Sub-Classes if discovery and further investigation reveal that they should be expanded or otherwise modified.

39.     **Numerosity**: The members of each Class and Sub-Class are so numerous that joinder of all members of every Class and Sub-Class would be impracticable. Plaintiffs reasonably believe that Class and Sub-Class members number hundreds of thousands of people or more in the aggregate and well over 1,000 in the smallest of the class or sub-classes. The names and addresses of Class and Sub-Class members are identifiable through documents maintained by Defendants.

40.     **Commonality and Predominance**: This action involves common questions of law or fact, which predominate over any questions affecting individual Class and Sub-Class members, including:

    a.      Whether Defendants engaged in the wrongful conduct alleged herein;

b.      Whether Defendants owed a legal duty to Plaintiffs and the other Class members to exercise due care in collecting, storing, and safeguarding their PII;

c.      Whether Defendants negligently or recklessly breached legal duties owed to Plaintiffs and the other Class members to exercise due care in collecting, storing, and safeguarding their PII;

d.      Whether Defendants failed to implement and maintain reasonable securities practices and procedures to protect against the Starwood Data Breach;

e.      Whether Defendants' conduct was negligent or willful;

f.      Whether Defendants acted intentionally in violating the privacy rights of Plaintiffs and Class and Sub-Class members.

g.      Whether Marriott was unreasonable in its delay of notifying affected customers of the Starwood Data Breach;

h.      Whether Defendants' alleged misconduct amounts to egregious breaches of social norms;

i.      Whether Defendants' alleged misconduct violated the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511, *et seq.*;

j.      Whether Defendants' alleged misconduct violated the Delaware Personal Information Protection Act, Del. Code tit. 6, § 12B-101, *et seq.;*

k.      Whether Defendants' alleged misconduct violated the Colorado Consumer Protection Act, Colo. Rev. Stat 6-1-101, et seq.

l.      Whether Defendants' alleged misconduct violated the Colorado Security Breach Notification Act, Colo. Rev. Stat 6-1-716, et seq.

14

m.      Whether Defendants' alleged misconduct violated the New Jersey Customer Security Breach Disclosure Act, N.J. Stat. Ann. §§ 56:8-163, et seq.

n.      Whether Defendants' alleged misconduct violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, et seq.

o.      Whether Plaintiffs and the other Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief; and

p.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

41.      Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the members of the Class and Sub-Classes. Similar or identical statutory and common law violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

42.      **Typicality**: Plaintiffs' claims are typical of the claims of the other members of their respective classes because, *inter alia*, Plaintiffs and the other Class and Sub-Class members were injured through the substantially uniform misconduct by Defendants.  Plaintiffs are advancing the same claims on behalf of themselves and all other Class and Sub-Class members, and there are no defenses that are unique to Plaintiffs.  The claims of Plaintiffs and those of other Class and Sub-Class members arise from the same operative facts and are based on the same legal theories.

43.      **Adequacy of Representation**: Plaintiffs are adequate representatives of the Class and Sub-Classes because their interests do not conflict with the interests of the other Class and Sub-Class members they seek to represent; they have retained counsel competent and

experienced in complex class action litigation; and they will prosecute this action vigorously. The interests of Class and Sub-Class members will be fairly and adequately protected by Plaintiffs and their counsel.

44.     **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action.  The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class and Sub-Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class and Sub-Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class and Sub-Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

45.     Further, Defendants have acted or refused to act on grounds generally applicable to the Class and Sub-Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class and Sub-Classes as a whole is appropriate under Rule 23(b)(2).

46.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.      Whether Defendants engaged in the wrongful conduct alleged herein;

b.      Whether Defendants owed a legal duty to Plaintiffs and the other Class members to exercise due care in collecting, storing, and safeguarding their PII;

c.      Whether Defendants negligently or recklessly breached legal duties owed to Plaintiffs and the other Class members to exercise due care in collecting, storing, and safeguarding their PII;

d.      Whether Defendants failed to implement and maintain reasonable securities practices and procedures to protect against the Starwood Data Breach;

e.      Whether Defendants' conduct was negligent or willful;

f.       Whether Defendants acted intentionally in violating the privacy rights of Plaintiffs and the other Class and Sub-Class members.

g.      Whether Marriott was unreasonable in its delay of notifying affected customers of the Starwood Data Breach;

h.      Whether Defendants' alleged misconduct amounts to egregious breaches of social norms;

i.      Whether Defendants' alleged misconduct violated the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511, *et seq.*;

j.      Whether Defendants' alleged misconduct violated the Delaware Personal Information Protection Act, Del. Code tit. 6, § 12B-101, *et seq.;*

k.      Whether Defendants' alleged misconduct violated the Colorado Consumer Protection Act, Colo. Rev. Stat 6-1-101, et seq.

l.      Whether Defendants' alleged misconduct violated the Colorado Security Breach Notification Act, Colo. Rev. Stat 6-1-716, et seq.

m.      Whether Defendants' alleged misconduct violated the New Jersey Customer Security Breach Disclosure Act, N.J. Stat. Ann. §§ 56:8-163, et seq.

n.      Whether Defendants' alleged misconduct violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, et seq.

o.      Whether Plaintiffs and the other Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief; and

p.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

## CLAIMS ALLEGED ON BEHALF OF ALL CLASSES

### First Claim for Relief
### Negligence

47.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

48.     Defendants have a duty to exercise reasonable care to protect and secure Plaintiffs' and Class members' PII.

49.     Through their acts and omissions, Defendants breached their duty to use reasonable care to protect and secure Plaintiffs' and Class members' PII by employing substandard or non-existent data and cybersecurity practices.

50.     It was reasonably foreseeable, particularly given legal requirements governing consumer data protection and the growing number of data breaches of PII that the failure to reasonably protect and secure Plaintiffs' and Class members' PII would result in an unauthorized party gaining access to Marriott's networks, databases, or computers that stored or contained Plaintiffs' and Class members' PII.

51.     Defendants' negligence directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class members' PII, and Plaintiffs and Class members have suffered and will continue to suffer damages as a result of Defendants' conduct.

52.     Plaintiffs and Class members seek damages and other relief as a result of Defendants' negligence.

**Second Claim for Relief**
**Violation of the Delaware Consumer Fraud Act**
**(Del. Code Ann. tit. 6, § 2511, *et seq*.)**

53.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

54.     Plaintiffs bring this claim pursuant to the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511 *et seq*. ("DCFA").

55.     Plaintiffs and the other Class members are "persons" within the meaning of Del. Code Ann. tit. 6, § 2511.

56.     The DCFA provides that a person may not engage in unfair or deceptive merchandising practices in the conduct of any trade or commerce, including the "use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact."  Del. Code Ann. tit. 6, § 2512-13.  Defendants participated in unfair and deceptive acts that violated the DCFA.

57.     In the course of their business, Defendants intentionally concealed and suppressed facts concerning their failures to secure their customers' PII and the Starwood Data Breach.

58.     Plaintiffs and the other Class members had no way of discerning that Defendants' representations were false and misleading until the November 30, 2018 announcement of the

Starwood Data Breach. Thus, acting reasonably, Plaintiffs and the other Class members did not and could not have unravel Defendants' deception earlier.

59.     Defendants' actions as set forth above occurred in the conduct of trade or commerce.

60.     The DCFA provides that "[i]t is the intent of the General Assembly that [unfair or deceptive merchandising practices] be swiftly stopped and that this subchapter shall be liberally construed and applied to promote its underlying purposes and policies." Del. Code Ann. tit. 6, § 2512.

61.     Defendants intentionally and knowingly misrepresented material facts regarding their efforts to secure their customers' PII, as well as facts concerning the Starwood Data Breach, with an intent to mislead Plaintiffs and Class members.

62.     Defendants knew or should have known that their conduct violated the DCFA.

63.     Defendants' promise of securing their customers' PII was material to Plaintiffs and the other Class members.

64.     Defendants' unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Plaintiffs and the other Class members, about the true, undisclosed facts surrounding their efforts to secure their customers' PII.

65.     Defendants also committed a violation of the Delaware Personal Information Protection Act, as alleged below, by negligently and recklessly failing to provide Plaintiffs and the other Class members reasonable and adequate security measures, and unreasonably delaying informing Plaintiffs and the other Class members about the Starwood Data Breach until long after Defendants had learned that the breach had occurred.

66.     Plaintiffs and the other Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

67.     Defendants had an ongoing duty to all Marriott customers to refrain from unfair and deceptive practices under the DCFA.

68.     Defendants' violations present a continuing risk of deception to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

69.     As a direct and proximate result of Defendants' violations of the DCFA, including by violating the Delaware Personal Information Protection Act, Plaintiffs and the other Class members have suffered injury-in-fact and/or actual damage.

70.     Defendants' unfair and deceptive acts, as alleged herein, were fraudulent, gross, oppressive, and aggravated, and involved a breach of a trust and/or confidence.

71.     Plaintiffs and the other Class members seek actual damages, punitive damages, attorneys' fees, and any other just and proper relief available under the DCFA.

**Third Claim for Relief**
**Violation of Delaware Personal Information Protection Act**
**(Del. Code tit. 6, § 12B-101, *et seq*.)**

72.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

73.     The Starwood Data Breach constituted a "breach of security" within the meaning of Del. Code tit. 6, § 12B-101.

74.     Defendants negligently and recklessly failed to provide Plaintiffs and the other Class members reasonable and adequate security measures.   Defendants also unreasonably

delayed in informing Plaintiffs and the other Class members about the Starwood Data Breach until long after Defendants had learned that the breach had occurred.

75.     The Delaware Personal Information Protection Act requires the notice of a breach to impacted persons "not later than 60 days after determination of the breach of security." Del. Code tit. 6, § 12B-102.  Defendants, as alleged herein, disclosed the Starwood Data Breach 83 days after they were aware of Starwood Data Breach, in direct violation of the Delaware Personal Information Protection Act.

76.     As a result of Defendants' conduct, Plaintiffs and the other members of the Class have incurred and will incur economic damages related to the expenses for credit monitoring and other related actions to protect their PII. Plaintiffs and the other members of the Class would not have purchased accommodations from Defendants and/or would have taken more precautions relating to their PII had they known the PII would not be adequately protected.

77.     Pursuant to Del. Code tit. 6, § 12B-104, Plaintiffs and the other members of the Delaware Class seek actual damages and any other just and proper relief available.

## Fourth Claim for Relief
### Negligence Per Se

78.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

79.     As set forth above, pursuant to Delaware law, Defendants were required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and the other Class members' PII.

80.     Defendants breached their duties by failing to employ industry standard data and cybersecurity measures that complied with those laws.

81.     Defendants' failure to comply with applicable federal and state laws constitutes negligence per se.

82.     It was reasonably foreseeable that Defendants' failure to reasonably protect and secure Plaintiffs' and Class members' PII in compliance with applicable laws would result in an unauthorized party gaining access to Defendants' networks, databases, or computers that stored or contained Plaintiffs' and the other Class members' PII.

83.     Defendants' negligence directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class members' PII, causing them to suffer – and to continue to suffer – damages as a result of Defendants' conduct.

84.     Plaintiffs and the other Class members seek damages and other relief as a result of Defendants' negligence.

## Fifth Claim for Relief
## Unjust Enrichment

85.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

86.     Plaintiffs and the other Class members conferred benefits on Defendants by paying for accommodations.

87.     Defendants knowingly and willingly accepted monetary benefits for their accommodations from Plaintiffs and the other Class members, but failed to honor their obligations to Plaintiffs and the other Class members, including the protection of their PII.

88.     Under the circumstances described herein, it is inequitable for Defendants to retain the monetary benefits they received at the expense of Plaintiffs and the other Class members.

89.     By engaging in the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiffs and the other Class members.  Under the circumstances, it would be contrary to equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received in light of the violations of law detailed herein.

90.     As a result of Defendants' unjust enrichment, Plaintiffs and the other Class members have suffered injury and are entitled to reimbursement, restitution, and disgorgement by Defendants of the monetary benefit conferred upon them by Plaintiffs and the other Class members.

## Sixth Claim for Relief
## Breach of Implied Contract

91.     Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

92.     Plaintiffs and the other Class members entered into implied contracts with Defendants under which they provided personal information, including PII, in order to book hotel rooms from Defendants with the understanding that Defendants agreed to safeguard and protect that information and would timely notify them of any unauthorized access to that information.

93.     Defendants, for their part, received PII from Plaintiffs and the other Class members with the understanding that such information would not be disclosed or disseminated to the public or any unauthorized third parties.

94.     Defendants breached their implied contracts with Plaintiffs and the other Class members by failing to safeguard the PII of Plaintiffs and the other Class members and by permitting the compromise of that information to unauthorized individuals.

24

95.     Due to Defendants' failure to prevent, detect, and/or avoid the Starwood Data Breach from occurring by failing to follow best information security practices to secure the PII of Plaintiffs and the other Class members, that information was compromised by unauthorized third parties.

96.     As a direct and proximate result of Defendants' breach of their implied contracts, Plaintiffs and the other Class members suffered damages including, but not limited to, identity theft, the loss of the value of their personal information, the compromise and disclosure of that information, and the continued risk to that information, all of which have a monetary value to be proven at trial.

## ADDITIONAL CLAIMS ALLEGED ON BEHALF OF THE COLORADO SUB-CLASS ONLY

### Seventh Claim for Relief
### Violation of Colorado Consumer Protection Act
### (Colo. Rev. Stat 6-1-101, *et seq*.)
### (In the Alternative)

97.     Plaintiff Moore ("Colorado Plaintiff") hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

98.     Colorado Plaintiff brings this claim on behalf of herself and the Colorado Sub-Class who are all residents of Colorado.

99.     Defendants are a "person" as defined by Colo. Rev. Stat. § 6-1-102(6). Colorado Plaintiff and the other Colorado Sub-Class members are actual or potential consumers of the products and services offered by Defendants.

100.    Defendants, operating in Colorado, engaged in deceptive, unfair, and unlawful trade acts or practices in the course of their business, vocation, or occupation, in violation of Colo. Rev. Stat. § 6-1-105, including but not limited to the following:

a.      Knowingly misrepresenting and fraudulently advertising material facts pertaining to their products and services to the Colorado Sub-Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Colorado Sub-Class Members' PII from unauthorized disclosure, release, data breaches, and theft, in violation of Colo. Rev. Stat. §§ 6-1-105(e), (g), (i), and (u);

b.      Knowingly misrepresenting material facts pertaining to their products and services to the Colorado Sub-Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Colorado Sub-Class Members' PII, in violation of Colo. Rev. Stat. §§ 6-1-105(e), (g), (i), and (u);

c.      Knowingly omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Colorado Sub-Class Members' PII (intending to induce others to enter into a transaction), in violation of Colo. Rev. Stat. §§ 6-1-105(e), (g), (i), and (u);

d.      Engaging in deceptive, unfair, and unlawful trade acts or practices, in violation of Colo. Rev. Stat. § 6-1-105(3), by failing to maintain the privacy and security of Colorado Sub-Class Members' PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, including Colo. Rev. Stat. § 6-1-713.5, resulting in the Starwood Data Breach.

e.      Engaging in deceptive, unfair, and unlawful trade acts or practices, in violation of Colo. Rev. Stat. § 6-1-105(3), by failing to disclose the Starwood Breach to Colorado Sub-Class Members in a timely and accurate manner, contrary to the duties imposed by Colo. Rev. Stat. § 6-1-716(2); and

f.      Engaging in deceptive, unfair, and unlawful trade acts or practices, in violation of Colo. Rev. Stat. § 6-1-105(3), by failing to take proper action following the Starwood Data Breach to enact adequate privacy and security measures and protect Colorado Sub-Class Members' PII from further unauthorized disclosure, release, data breaches, and theft.

101.    Under Colo. Rev. Stat. § 6-1-713.5, Defendants "maintain[], own[], or license[] personal identifying information of an individual residing in [Colorado]," and thus are required to "implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal identifying information and the nature and size of the business and its operations." Defendants failed to maintain reasonable securities procedures and practices appropriate for the nature and size of their business and operations.

102.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of consumers' PII.

103.    Defendants intended to mislead Colorado Plaintiff and the other Colorado Sub-Class members and induce them to rely on Defendants' misrepresentations and omissions.

104.    Plaintiffs and the other Colorado Sub-Class members would not have purchased accommodations from Defendants and/or would have taken more precautions relating to their PII had had they known Defendants failed to employ necessary and adequate protection of their PPI.

105.    Defendants engaged in the above unfair and deceptive acts or practices in the course of their business.

106.    Defendants engaged in above unfair and deceptive acts or practices with malice and/or willfulness.

107.    As a direct and proximate result of Defendants' unfair and deceptive practices, Colorado Sub-Class members suffered injuries to legally protected interests, including their legally protected interest in the confidentiality and privacy of their personal information.

108.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Colorado Plaintiff and the other Colorado Sub-Class Members that they could not have reasonably avoided.  This substantial injury outweighs any benefits to consumers or to competition.

109.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Colorado Sub-Class Members' PII and that risk of a data breach or theft was high.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of the Colorado Sub-Class members.

110.    Colorado Plaintiff and Colorado Sub-Class Members seek relief under Colo. Rev. Stat. §§ 6-1-101, et seq., including, but not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

### Eighth Claim for Relief
### Violation of Colorado Security Breach Notification Act
### (Colo. Rev. Stat 6-1-716, *et seq.*)

111.    Colorado Plaintiff hereby repeats, realleges and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

112.    Defendants are a business that owns or licenses computerized data that includes Personal Information as defined by Colo. Rev. Stat. §§ 6-1-716(1) and 6 1-716(2).

113.    Colorado Plaintiff and Colorado Sub-Class PII includes Personal Information as covered by Colo. Rev. Stat. §§ 6-1-716(1) and 6-1-716(2).

114.    Under Colo. Rev. Stat. § 6-1-713.5, Defendants "maintain[], own[], or license[] personal identifying information of an individual residing in [Colorado]," and thus are required to "implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal identifying information and the nature and size of the business and its operations."

115.    Defendant are required to accurately notify Colorado Plaintiff and Colorado Sub-Class members if they become aware of a breach of its data security system in the most expedient time possible and without unreasonable delay under Colo. Rev. Stat. § 6-1-716(2).

116.    Because Defendants were aware of a breach of their security system, it had an obligation to disclose the Starwood Data Breach in a timely and accurate fashion as mandated by Colo. Rev. Stat. § 6-1-716(2).

117.    By failing to disclose the Starwood Data Breach in a timely and accurate manner, Defendants violated Colo. Rev. Stat. § 6-1-716(2).

118.    As a direct and proximate result of Defendants' violations of Colo. Rev. Stat. § 6-1-716(2), Colorado Plaintiff and Colorado Sub-Class members suffered damages, as described herein.

119.    Colorado Plaintiff and Colorado Sub-Class members seek relief under Colo. Rev. Stat. § 6-1-716(4), including actual damages and equitable relief.

## ADDITIONAL CLAIMS ALLEGED ON BEHALF OF THE
## NEW JERSEY SUB-CLASS ONLY

### Ninth Claim for Relief
### Violation of New Jersey Customer Security Breach Disclosure Act
### (N.J. Stat. Ann. §§ 56:8-163, *et seq.*)

120.    Plaintiff Desalvo ("New Jersey Plaintiff") hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

121.    New Jersey Plaintiff brings this claim on behalf of himself and the New Jersey Sub-Class who are all residents of New Jersey.

122.    Defendants are businesses that compile or maintain computerized records that include Personal Information on behalf of another business under N.J. Stat. Ann. § 56:8-163(b).

123.    New Jersey Plaintiff's and the other New Jersey Sub-Class members' PII includes Personal Information covered under N.J. Stat. Ann. §§ 56:8-163, et seq.

124.    Under N.J. Stat. Ann. § 56:8-163(b), "[a]ny business . . . that compiles or maintains computerized records that include Personal Information on behalf of another business or public entity shall notify that business or public entity, who shall notify its New Jersey customers . . . of any breach of security of the computerized records immediately following discovery, if the Personal Information was, or is reasonably believed to have been, accessed by an unauthorized person."

125.    Because Defendants discovered a breach of their security system in which Personal Information was, or is reasonably believed to have been, acquired by an unauthorized person and that Personal Information was not secured, Defendants had an obligation to disclose the Starwood Data Breach in a timely and accurate fashion as mandated under N.J. Stat. Ann. §§ 56:8-163, *et seq.*

126.    By failing to disclose the Starwood Data Breach in a timely and accurate manner, Defendants violated N.J. Stat. Ann. § 56:8-163(b).

127.    As a direct and proximate result of Defendants' violations of N.J. Stat. Ann. § 56:8-163(b), New Jersey Plaintiff and the other New Jersey Sub-Class members suffered the damages described herein.

128.    New Jersey Plaintiff and the other New Jersey Sub-Class members seek relief under N.J. Stat. Ann. § 56:8-19, including treble damages, attorneys' fees and costs, and injunctive relief.

### Tenth Claim for Relief
### Violation of New Jersey Consumer Fraud Act
### (N.J. Stat. Ann. §§ 56:8-1, *et seq*.)

### (In the Alternative)

129.    New Jersey Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

130.    New Jersey Plaintiff brings this cause of action on behalf of himself and on behalf of the New Jersey Sub-Class who are all New Jersey residents.

131.    Defendants are a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

132.    Defendants sell "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

133.    The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq*., prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on that concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

134.    Defendants' unconscionable and deceptive practices include:

a.    Failing to implement and maintain reasonable security and privacy measures to protect New Jersey Plaintiff's and the other New Jersey Sub-Class members' PII, which was a direct and proximate cause of the Starwood Data Breach;

b.    Failing to identify foreseeable security and privacy risks and remediate identified security and privacy risks, which was a direct and proximate cause of the Starwood Data Breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of New Jersey Plaintiff's and the other New Jersey Sub-Class members' PII, which was a direct and proximate cause of the Starwood Data Breach;

d.    Misrepresenting that they would protect the privacy and confidentiality of New Jersey Plaintiff's and the other New Jersey Sub-Class members' PII, including by implementing and maintaining reasonable security measures;

e.    Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of New Jersey Plaintiff's and the other New Jersey Sub-Class members' PII;

f.    Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure New Jersey Plaintiff's and the other New Jersey Sub-Class members' PII; and

g.    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of New Jersey Plaintiff's and the other New Jersey Sub-Class members' PII.

135.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

136.    Defendants intended to mislead New Jersey Plaintiff and the other New Jersey Sub-Class members and induce them to rely on Defendants' misrepresentations and omissions.

137.    Defendants acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded New Jersey Plaintiff's and the other New Jersey Sub-Class members' rights.   Defendants were on notice that their security and privacy protections were grossly inadequate prior to the Starwood Data Breach.

138.    As a direct and proximate result of Defendants' unconscionable and deceptive practices, New Jersey Plaintiff and the other New Jersey Sub-Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages – including from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and the loss of value of their PII.

139.    New Jersey Plaintiff and the other New Jersey Sub-Class members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class and Sub-Class members, respectfully request that this Court enter an Order:

A.    Certifying the Class and Sub-Classes and appointing Plaintiffs and their counsel to represent the Class and Sub-Classes;

33

B.       Finding that Defendants' conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

C.       Awarding monetary damages, including but not limited to, compensatory, incidental, and consequential damages commensurate with proof at trial for the acts complained of herein;

D.       Awarding punitive damages in an amount consistent with applicable statutes and precedent for those causes of action that permit such recovery;

E.       For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

F.       Appropriate declaratory relief against Defendants;

G.       Injunctive relief in the form of, *inter alia*, enjoining Defendants from engaging in further negligent, deceptive, unfair, and unlawful business practices alleged herein;

H.       Awarding attorneys' fees, where applicable;

I.       Awarding costs;

J.       Awarding of pre- and post-judgment interest on any amounts awarded; and

K.       For any and all other relief, the Court deems just and appropriate.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

DATED: December 13, 2018                    Respectfully submitted,

                                            */s/ Ivy T. Ngo*
                                            Ivy T. Ngo (#20639)
                                            **Franklin D. Azar & Associates, P.C.**
                                            14426 E. Evans Avenue
                                            Aurora, CO 80014
                                            Telephone: 303-757-3300
                                            Facsimile: 720-213-5131
                                            Email: ngoi@fdazar.com

                                            *Counsel for Plaintiffs*